**IRON WORKERS' LOCAL NO. 25 PENSION FUND; Iron Workers' Local Union No. 25 Individual Account Retirement Fund; Iron Workers' Health Fund of Eastern Michigan; Iron Workers Local No. 25 Vacation Pay Fund; and Iron Workers' Apprenticeship Fund of Eastern Michigan, Plaintiffs,**

v.

**NYEHOLT STEEL, INC., Defendant.**

Civil Action No. 95–40415.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 21, 1997.

Michael J. Asher, Sullivan, Ward, Bone, Tyler & Asher, Southfield, MI, for Plaintiffs.

James R. Peterson, Timothy J. Ryan, Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for Defendant.

## MEMORANDUM OPINION & ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

On November 16, 1995, plaintiffs Iron Workers Local No. 25 Pension Fund, Iron Worker's Local Union No. 25 Individual Account Retirement Fund, Iron Worker's Health Fund of Eastern Michigan, Iron Workers Local No. 25 Vacation Pay Fund and Iron Worker's Apprenticeship Fund of Eastern Michigan (collectively "Funds") filed the instant lawsuit against defendant Nyeholt Steel. The Funds claim that Nyeholt Steel is a signatory to a collective bargaining agreement ("CBA") entered into between Local Union No. 25 of the International Association of Bridge, Structural and Ornamental Iron Workers ("Local 25") and Great Lakes Fa-

bricators and Erectors Association, The Associated General Contractors of America, Detroit Chapter, Inc. and Michigan Conveyor Manufacturers Association, Inc. (collectively "The Associations"). The Funds further allege that Nyeholt Steel is delinquent in its duty under the CBA to make fringe benefit contributions. As third-party beneficiaries of the CBA, the Funds seek to recover these allegedly delinquent fringe benefit contributions pursuant to the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186 and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145.[1]

On February 14, 1997, the Funds filed a motion for summary judgment on their claim for delinquent fringe benefit contributions. On June 16, 1997, Nyeholt Steel filed a cross-motion for summary judgment on that claim.[2] This court, on July 16, 1997, conducted a hearing on these cross-motions for summary judgment. After reviewing the parties' written submissions and upon reflection of their oral arguments, this court will deny the Funds' motion for summary judgment and grant Nyeholt Steel's motion for summary judgment.

## FACTUAL BACKGROUND

Nyeholt Steel is a steel fabricator and erector. It commenced business in 1982 and currently has 15 employees. Bruce Nyeholt ("Nyeholt") is the Vice–President of this company.

On August 23, 1989, Nyeholt Steel was involved in the construction of the Mel Farr Ford automobile dealership in Pontiac, Michigan. While on the site, Nyeholt was approached by Jack Koby, President of Local 25. Koby informed Nyeholt that the site would be picketed and shut down if Nyeholt

did not hire a union crew to install the steel. Nyeholt did not hire any union force at that time.

Later that day, Koby returned to the site and presented Nyeholt with a document for him to sign, and allegedly stated:

I have a deal for you. If you sign this temporary agreement and allow us to get two of my iron workers to work with your men, I won't throw a picket line up.

(Nyeholt Dep. at 36–38). Nyeholt consented and signed the agreement presented by Koby, which reads as follows:

This Agreement is entered into between the International Association of Bridge, Structural & Ornamental Iron Workers, Local No. 25 and the undersigned Employer [Nyeholt Steel].

1. Local 25 and the Great Lakes Fabricators & Erectors Association, the Associated General Contractors of America, Detroit Chapter and the Michigan Conveyor Manufacturers Association, (hereinafter referred to as the Associations) are parties to a collective bargaining agreement with [a commencement date of June 1, 1987] an expiration date of May 31, 1989 [hereinafter "87–89 CBA"].

2. Local 25 and the Associations will be/are negotiating a new collective bargaining agreement to succeed the collective bargaining agreement referred to in paragraph 1 [hereinafter "89–92 CBA"].[3]

3. Pending reaching a new collective bargaining agreement between Local 25 and the Associations (including any period during which there is a strike or lockout between Local 25 and the Associations), Local 25 and the Employer will be bound by the wages, hours, fringe benefits and other terms and conditions provided for in

---

1. The Funds also seek interest, liquidated damages, attorneys' fees, court costs, audit, collections costs and such other sums that may become due the Funds during the pendency of this action.

2. This is the second summary judgment motion filed by defendant Nyeholt Steel. The previous motion was filed on September 30, 1996. Nyeholt Steel made two arguments in that prior motion, the first being that Nyeholt Steel had satisfied the Funds only request in their com-

plaint, to wit: the granting of an audit, and the second being that this case was not ripe for adjudication. On November 26, 1997, this court denied Nyeholt Steel's motion for summary judgment finding that the Funds' complaint contained more than merely a request for an audit and finding that this case *was* ripe for adjudication.

3. The 89–92 CBA covers the period June 1, 1989 through May 31, 1992.

**686**

the collective bargaining agreement referred to in paragraph 1.

4. When Local 25 and the Associations reach a new collective bargaining agreement, the Employer will be bound by the wages, fringe benefits, hours and all other terms and conditions contained therein and will be a party to said agreement.

5. The Employer will pay retroactively from June 1, 1989 any increases in wages and fringe benefits contained in the new collective bargaining agreement between Local 25 and the Associations.

(hereinafter the "Mel Farr Agreement"). On the top of the Mel Farr Agreement, Koby wrote "Mel Farr." On the side of this one-page agreement, he wrote "pay fringes weekly." At his deposition Koby explained that this was a "one job agreement" and that by signing the Mel Farr Agreement, Nyeholt Steel became a party to the 89–92 CBA only while working on the Mel Farr job. (Koby Dep. at 26–30).

In October, 1989, Nyeholt Steel secured a job to install a three-story stair at Howell Bank in Howell, Michigan. Nyeholt was informed by the general contractor that union erectors were required to complete that job. Nyeholt contacted Loren Nichols, a business agent of Local 25, and requested a referral to a union erector. Nichols sent Dave Miller to meet with Nyeholt on October 30, 1989, and these two men discussed the plans for the Howell Bank project.

On October 31, 1989, the day after Miller and Nyeholt met, Nichols informed Nyeholt

that Miller was an iron worker from the hall and that Miller and three other workers would do the required work after Nyeholt signed a "temporary" or "interim" agreement. (Nyeholt Dep. p. 47). On October 31, 1989, Nyeholt signed an agreement ("Howell Bank Agreement") identical in form to the Mel Farr Agreement. After signing the Howell Bank Agreement, Nyeholt put Miller and his three-co-workers on his payroll. Nyeholt also provided them with the equipment to install the stair at Howell Bank. (Nyeholt Dep. p. 43).

On November 16, 1995, the Funds filed the instant action. The Funds claim that by signing the Mel Farr and Howell Bank Agreements, Nyeholt Steel became a party to the 89–92 CBA and must make fringe benefit contributions pursuant to Article 17 therein [4] not only for work performed on the Mel Farr and Howell Bank projects for which Nyeholt Steel has already made contributions, but also for other jurisdictional work (a.k.a. "covered work") [5] performed by Nyeholt Steel employees since the date the two Agreements were executed. As for the precise amount of covered work performed by Nyeholt Steel employees for which it allegedly has not made any contributions, the Funds contend that this figure cannot be ascertained with specificity because Nyeholt Steel has not kept any records tracking such information, with the exception of three categories of documents.[6] In the absence of records showing the actual number of hours worked by defendant employees on specific jobs, the Funds assert that Nyeholt Steel

4. Article 17 provides in pertinent part that:

1. An employer shall make contributions to the various fringe benefit funds hereinafter described [health fund, pension fund, individual account retirement plan, apprenticeship fund, national apprenticeship fund, vacation pay fund] in the respective amounts and under the respective conditions set forth herein.

2. Monthly contributions to all such Funds are payable and must be received by the bank depository on the 26th day of the month following the month in which the hours are worked.

\* \* \* \* \* \*

14. The Employer agrees to adopt, abide by and be bound by all of the provisions of the collective bargaining agreement heretofore entered into between Local Union No. 25 and the

Associations, and any modifications, extensions, or renewals thereof, with the same force and effect as though the aforesaid collective bargaining agreement was set forth here in full.

5. Article 2 of the CBA entitled "Craft Jurisdiction" explains that the CBA "covers all field erection and construction work traditionally performed by and coming under the jurisdiction of The Associations." Koby testified at his deposition that basically "the only hours that the contractor would have to pay fringe benefit funds for would be the hours worked by people out on the job site erecting steel." (Koby Dep. at 32).

6. Nyeholt Steel supposedly has kept records for 1993, 3–4 months in 1994 and for 300 miscellaneous hours.

must make fringe benefit contributions for *all* work done by its employees since the date the Agreements were signed.[7]

Nyeholt Steel concedes that it is a signatory to the CBA with respect to the Mel Farr and Howell Bank projects and that it was therefore required to pay fringe benefits to the Funds for the work done on these projects, which it has done. Aside from the work performed on these two jobs, however, Nyeholt Steel emphatically denies that it is a party to the 89–92 CBA and hotly contests the Funds' assertion that it is delinquent in paying fringe benefit monies to the Funds.

### ANALYSIS

On February 14, 1997, the Funds filed a motion for summary judgment on their claim against Nyeholt Steel for delinquent fringe benefit contributions.[8] Specifically, the Funds seek summary judgment on their claim for outstanding funds for the time period commencing September, 1989 and ending December, 1995.[9] The Funds contend that any reasonable juror would conclude that by signing the Mel Farr and Howell Bank Agreements, Nyeholt Steel became a party to the 89–92 CBA and thus compelled to make fringe benefit contributions pursuant thereto not only for work performed on the Mel Farr and Howell Bank projects, but for all jurisdictional work performed after the date the two Agreements were signed. In response, Nyeholt Steel filed a summary judgment motion of its own arguing precisely the opposite—that any reasonable juror would conclude that it is *not* a party to the

89–92 CBA for any projects other than the Mel Farr and Howell Bank projects and that Nyeholt Steel therefore does not owe any fringe benefit monies for work performed on ventures aside from those of Mel Farr and Howell Bank. Thus, the salient issue raised in these cross-motions for summary judgment is whether Nyeholt Steel, by signing the Mel Farr and Howell Bank Agreements, is a party to the 89–92 CBA and must make fringe benefit contributions thereto not only for the work done on the Mel Farr and Howell Bank jobs, but also for other jurisdictional work performed by Nyeholt Steel employees since 1989.

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lob-*

---

**7.** The Funds concede that they have never notified Nyeholt Steel employees that they were participants in the Funds and/or eligible for benefits from the Funds.

**8.** This claim was brought pursuant to Sections 502(g)(2) and 515 of ERISA. Section 502(g)(2) provides that if judgment in favor of a plan is issued, the court shall award the plan:
    (A) the unpaid contributions,
    (B) interest on the unpaid contributions,
    (C) an amount equal to the greater of—
      (i) interest on the unpaid contributions, or
      (ii) liquidated damages . . .
    (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
    (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).
    Section 515 of ERISA provides as follows:
    Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

**9.** An audit was performed for the time period of September, 1989 through December, 1995 and revealed that Nyeholt Steel employees worked 37,000 hours. Based on 37,000 hours of work, the amount of fringe benefit contributions owed to the Funds would be $499,215.97.

*by, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510. In deciding a motion for summary judgment, the court must consider all evidence together with all inferences to be drawn therefrom "in light most favorable to the party opposing the motion." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.,* 630 F.2d 1155, 1158 (6th Cir.1980).

If the movant meets the standard specified at Rule 56(c), then the opposing party must come forth with "specific facts showing that there is a genuine issue for trial." *First National Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 1583, 20 L.Ed.2d 569 (1968); Fed.R.Civ.P. 56(e). The non-moving party "is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.1993), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). And, "if the adverse party does not respond, summary judgment, if appropriate shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976); *O'Hara v. Wigginton,* 24 F.3d 823, 826–27 (6th Cir. 1994).

### Liability for Delinquent Contributions

■ "Obligations under a collective bargaining agreement, like those under contracts in general, rest ultimately on the principle of mutual assent." *Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501 (9th Cir.1984). Typically, an employer's assent to be bound by a collective bargaining agreement is found in his or her signing of a "short form agreement." Put simply, short form agreements are agreements wherein a smaller, usually independent contractor (i.e., Nyeholt Steel) consents to be bound by a collective bargaining agreement negotiated by a union (i.e., Local No. 25) and multi-employer bargaining group representing contractors within a particular jurisdiction (i.e., the Associations). *Carpenters Local v. W.D. George Const. Co.,* 792 F.2d 64, 68–69 (6th Cir.1986).

■ An employer's mere signing of a short form agreement does not bind him to the underlying collective bargaining agreement in all instances. For example, if the employer's signature was procured by fraud in the execution, then the agreement is void *ab initio. Operating Engineers,* 737 F.2d at 1504.[10] Fraud in the execution arises when "a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract." Restatement (Second) of Contract § 163 (1981). *See also Rozay's Transfer,* 791 F.2d at 774 (citing Uniform Commercial Code § 3–305(2)(c) and Restatement (Second) of Contracts § 163 (1981), and cited with approval by this court in *Allied Fence Sys.,* 922 F.Supp. at 1257 and *Bricklayers' Pension Trust Fund–Metro, v. Chirco,* 675 F.Supp. 1083, 1086 (E.D.Mich.1987)); *Operating Eng'rs.,* 737 F.2d at 1504 ("he who signs a document reasonably believing it is something quite different than it is cannot be

---

10. Courts generally construe Section 515 of ERISA, 29 U.S.C. § 1145, "as sharply limiting the defenses available to employers in actions seeking payment of delinquent ERISA trust fund contributions." *Id.* at 1255–56 (citing *Southwest Administrators, Inc. v. Rozay's Transfer,* 791 F.2d 769, 773 (9th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987)). Basically, three defenses are available:

    (1) the pension contributions themselves are illegal; (2) the collective bargaining agreement is void *ab initio,* as where there is fraud in the

execution, and not merely voidable, as in the case of fraudulent inducement; and (3) the employees have voted to decertify the union as [their] bargaining representative, thus prospectively voiding the union's collective bargaining agreement.

*Id.* at 1256 (citing *Agathos v. Starlite Motel,* 977 F.2d 1500, 1505 (3d Cir.1992)). *See also Iron Workers' No. 25 Pension Fund v. Klassic Servs.,* 913 F.Supp. 541, 544 (E.D.Mich.1996). Only the second defense is relevant in the case *sub judice.*

bound to the terms of the document").[11] In other words, fraud in the execution (a.k.a. "fraud in factum") occurs when a misrepresentation is made which induces a party believe that he is not assenting to any contract or that he is assenting to a contract entirely different from the proposed contract. Restatement (Second) of Contracts § 163, cmt. a (1981).

In *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir.1984), the court ruled that an employer was not obligated to make benefit contributions under a collective bargaining agreement because his signature on a short-form agreement was procured by fraud in the execution. In that case, Griffith Construction Company, a general contractor, contacted Bill W. Gilliam in May 1977 and asked to rent a bulldozer and operator to use on a particular project. The operator had to be a union member, which Gilliam was not. Therefore, Gilliam visited the local union office in order to become a union member as an owner-operator so that he could operate his bulldozer on the Griffith job. The union business agent produced various documents, stating that they were the standard forms signed by owner-operators. Gilliam did not read any of the documents, but signed the documents nonetheless, relying wholly on the agent's representation that the forms were standard owner-operator forms. One of the documents that Gilliam signed, however, was not a standard application for union membership but, instead, a short-form bargaining agreement. After signing, Gilliam did not receive copies of the short-form agreement or the union's master labor agreement.

A three-judge panel of the Ninth Circuit held that because the union agent had represented to Gilliam that he was signing a document for union membership only, "[u]nder the circumstances, Gilliam reasonably and justifiably thought the documents involved only an application for union membership and his [unknowing] signing of the short-term agreement did not create a binding collective bargaining agreement." *Id.* at 1505. The appellate court affirmed the lower court's finding of fraud in the execution and judgment and award of attorney fees for Gilliam. *See also Iron Workers' No. 25 Pen. Fund v. Klassic Servs.*, 913 F.Supp. 541 (E.D.Mich.1996) (court allowed defendant to amend his pleadings under Federal Rule of Civil Procedure 15 to assert the defense of fraud in the execution where the union allegedly told the employer that the collective bargaining agreement covering June 1, 1989 through May 31, 1992 only covered work to be performed at a specific location for approximately four days and where the union, at the time of signing, only provided employer a copy of the signature page and not the entire collective bargaining agreement). *Compare Agathos v. Starlite Motel*, 977 F.2d 1500, 1506 (3rd Cir.1992) (court held that there was no fraud in the execution because employer made no argument that he signed a document different than the one he believed he signed or that the union misrepresented the nature of the document signed); *Allied Fence Sys.*, 922 F.Supp. at 1259 (employer claimed that the collective bargaining agreement was void due to fraud in the execution because he had no idea that he was signing a collective bargaining agreement due to misrepresentations by the local agent; employer leafed through the actual 26 page collective bargaining agreement and court held that the employer's ignorance was not excusable in light of his "ample and uncoerced opportunity to review the document he received").

### The Mel Farr Agreement

■ In the instant case, based on the undisputed facts, this court finds as a matter of

---

11. Fraud in the *execution* is distinguishable from fraud in the *inducement*. The latter "induces a party to assent to something he otherwise would not have" while the former "induces a party to believe the nature of his act is something entirely different than it actually is." *Rozay's Transfer*, 791 F.2d at 774. *See e.g., Southern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Bjorklund*, 728 F.2d 1262, 1265–66 (9th Cir.1984) (three-judge panel of Ninth Circuit affirmed the district court's award of summary judgment to plaintiff on grounds that fraud *in the inducement*, as opposed to fraud in the execution, was not a valid defense; employer signed a CBA after being falsely assured by an officer of the union that the employer would, himself, be eligible for pension benefits under the CBA and that he would only have to make contributions on behalf of part-time, but not full-time employees).

law that Nyeholt Steel has established fraud in the execution of the Mel Farr Agreement. Therefore, this court holds that Nyeholt's signature on that Agreement did not bind Nyeholt Steel to the CBA during the time period of September, 1989 through December, 1995 for any projects other than the Mel Farr project.

First, it is uncontroverted that Koby, the union representative, made misrepresentations which induced Nyeholt to assent to a contract entirely different from the proposed contract.[12] When Koby presented the Mel Farr Agreement to Nyeholt for him to sign, Koby represented the document as a "one-job agreement." (Nyeholt Aff. ¶ 6, Koby Dep. p. 30). In fact, Koby wrote the words "Mel Farr" at the top of the document Nyeholt signed on August 23, 1989 so as to limit, accordingly, Nyeholt Steel's subscription to the underlying 89–92 CBA. Based on these representations, Nyeholt signed the Mel Farr Agreement. Nyeholt believed that by his signing of the same, he was bound to the terms of the underlying CBA for **one job.** Nyeholt was totally incognizant of the fact that the CBA contained no provision effectuating the durational limitation to which Nyeholt and Koby agreed, and, in fact, contained a provision obligating Nyeholt Steel to make fringe benefit contributions for all jurisdictional work henceforth performed by Nyeholt Steel employees.[13]

Second, any reasonable juror would find Nyeholt's ignorance excusable under the facts of this case. Nyeholt avers that he was never given a copy of the underlying forty-page CBA and thus was totally unaware of the fact that he was assenting to anything other than a one-job deal. No evidence has been introduced to refute this averment.[14]

Also, at the time Nyeholt signed the Mel Farr Agreement, he was not familiar with collective bargaining agreements. To be sure, Nyeholt had no prior experience in negotiating or executing them since his employees were not then and are not now unionized.[15] (Nyeholt Aff. at ¶ 13). *Compare Bricklayers' Pension Trust Fund–Metropolitan Area v. Chirco,* 675 F.Supp. at 1087 (holding that employer's defense based on ignorance of the essential terms of the collective bargaining agreement was not credible in part because employer had previously entered into several collective bargaining agreements). Moreover, time was of the essence. Nyeholt was faced with an imminent strike and was rushed into signing the August 23, 1989 document so as to avoid this occurrence.

In short, based on the evidence presented construed in a light most favorable to the Funds, this court finds fraud in the execution of the Mel Farr Agreement. Nyeholt's signing of this Agreement did not create a valid CBA except for the work performed in connection with the Mel Farr project, for which Nyeholt Steel has dutifully made fringe benefit contributions.[16]

### The Howell Bank Agreement

██ This court likewise finds that there is no genuine issue of material fact as to whether there was fraud in the execution of the Howell Bank Agreement. Based on the facts, viewed in a light most favorable to the Funds, there was fraud in the execution of this Agreement.

This court finds that no reasonable juror could conclude otherwise than that Nichols intentionally led Nyeholt to believe his signa-

---

**12.** This court finds that an agreement that binds a party to the terms of a CBA for one job is of a different nature than an agreement that obligates the party indefinitely.

**13.** Also, the fact that Local 25 made Nyeholt sign another agreement two months later (i.e., the Howell Bank Agreement) is evidence that Local 25 viewed the Mel Farr Agreement as a "one-job" CBA.

**14.** Koby testified at his deposition that he cannot recall whether he provided Nyeholt with a copy of the underlying CBA. (Koby Dep. at 28).

**15.** Nyeholt Steel also claims that it provided its own benefits to its employees for the time period of September, 1989 through December, 1995, including health and dental insurance, retirement plans, paid vacations and life insurance. (Roselyn Nyeholt Aff. at ¶ 3).

**16.** At oral argument, counsel for Nyeholt Steel represented that Nyeholt Steel has made fringe benefit contributions for work done on the Mel Farr and Howell Bank projects. Counsel for the Funds did not contest this representation.

ture on the Howell Bank Agreement created a valid CBA for only one job. Viewing the evidence in a light most favorable to the Funds, the evidence is that while on site and after Nyeholt Steel fabricated the stair for Howell Bank, Nyeholt was told by individuals from Russcom Construction that Nyeholt Steel would have to employ a union crew to erect the stair. (Nyeholt Dep. at 41). Nyeholt left numerous messages with an erector he "normally" used, Steel Erectors, Inc., but to no avail. (Nyeholt Dep. at 41–42). After receiving no response from Steel Erectors, Inc. and constrained by time, Nyeholt eventually contacted Loren Nichols, the business agent for Local 25, and requested a referral to a union contractor for the Howell Bank job.[17] (Nyeholt Dep. at 42). Nichols could not locate a union contractor for this particular undertaking, but told Nyeholt that Local 25 could supply him with union help if Nyeholt would sign an "interim" agreement. (Nichols Dep. at 12). Nichols presented a copy of the Howell Bank Agreement and a copy of the underlying CBA in booklet form to Nyeholt, and Nyeholt signed the Howell Bank Agreement under pressure and in the presence of Nichols.

From these facts, it is clear that Nyeholt approached Nichols for the purpose of securing union labor for one job only—the Howell Bank project. Nyeholt did not discuss the possible use of Local 25 workers in the future, nor did he contemplate an on-going arrangement in which Local 25 would supply union labor on an "as needed" basis to Nyeholt Steel. To the contrary, Nyeholt called Nichols out of desperation to quickly secure union labor for one project, after Nyeholt's attempts at contacting another union erector proved unavailing. Nichols was aware of Nyeholt's limited needs and told Nyeholt he would furnish workers on this job if Nyeholt signed an "interim" agreement. In the context of the parties' conversations, which pertained exclusively to the Howell Bank job, Nichols use of the word "interim" intimated to Nyeholt that the Agreement was for a limited time, and specifically for the duration of the Howell Bank job. Indeed, Nyeholt, who is not adept in union relations, reason-

ably understood Nichol's use of the word "interim" to mean that the Agreement applied to a single project based on his previous experience with Koby. (Nyeholt Aff. ¶ 10). At no time did Nichols inform Nyeholt that the contract he signed would pertain to any other jobs or for that matter, any other employees than the four individuals he sent to Howell Bank.

There is other compelling evidence demonstrating that Nyeholt's signature on the Howell Bank Agreement did not create a valid CBA for any other job than the Howell Bank job. It is uncontroverted that Nyeholt Steel has never operated as a union business, and its employees have never sought benefits from the Funds. In fact, neither the Funds, nor agents or members of Local 25 ever informed Nyeholt Steel employees that they were participants and possibly eligible for benefits from the Funds as they were required to do under ERISA, 29 U.S.C. §§ 021, 1022, 1024(b). (Plaintiff's Response to Defendant's Amended Request for Admissions, Interrogatories and Production of Documents). Moreover, Nyeholt Steel has provided its own fringe benefits to its employees, including health and dental insurance, retirement plans, paid vacations, and life insurance, since Nyeholt Steel was completely ignorant that there was a CBA purportedly providing the same. (Roselyn Nyeholt Aff. at ¶ 3). Indeed, it was not until the filing of the lawsuit, approximately six years after the Mel Farr and Howell Bank Agreements were signed, that Nyeholt Steel was made aware that it was allegedly a party to the 89–92 CBA and that it owed approximately one-half million dollars to the Funds. In this respect, the case *sub judice* resembles *Gilliam,* 737 F.2d at 1502, in which the employer did not operate as a union business, no employees ever sought benefits from the funds and the employer did not have *any* contact whatsoever with the funds until more than four years, at which time the funds asserted that the employer owed $365,000.

Also, this court finds that any reasonable juror would deem Nyeholt's ignorance of the terms of the 89–92 CBA excusable. Nyeholt signed the Howell Bank Agreement under

---

**17.** A union contractor is an individual who already had a contract with Local 25.

pressure and in the presence of Nichols. He did not have ample time to review the contents of the underlying CBA, which was allegedly handed to him in booklet form.

In sum, this court grants summary judgment to Nyeholt Steel and denies summary judgment to the Funds on the issue of Nyeholt Steel's liability under the Mel Farr Agreement and Howell Bank Agreements.[18] This court finds that Nyeholt Steel is not obligated to the Funds for any outstanding fringe benefit contributions for the time period of September, 1989 through December, 1995, or otherwise.

### ORDER

**IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment is DENIED.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is GRANTED.

**SO ORDERED.**

18. ·This court does not and need not reach the other issue raised in Nyeholt Steel's response brief, to wit: whether fraud in the inducement is a valid defense in this case. This court· does note, however, that it has reservations about whether the defense of fraud in the inducement is valid here.