MICHIGAN REGIONAL COUNCIL OF CARPENTERS, Plaintiff–Appellee,

v.

NEW CENTURY BANCORP, INC., Mary Garofalo, Thomas Sheridan, Defendants–Appellants,

Steven M. Kirkpatrick, Bruce Carleton, J. Grant Smith, Kimberly Mitseff, Gary Vetter, William Kreger, Frank Stella, Plante & Moran, Defendants–Appellees.

No. 02–1585.

United States Court of Appeals, Sixth Circuit.

April 8, 2004.

Lorrey Michela, Lynn F. McGuire, Novara, Tesija & Michela, Southfield, MI, for Plaintiff–Appellee.

James L. Elsman, Birmingham, MI, Keefe A. Brooks, Butzel Long, Detroit, MI, Dennis M. Haffey, Laura C. Baucus, Dykema Gossett, Bloomfield Hills, MI, Eric M. Nemeth, Lynn M. Brimer, Raymond & Prokop, Southfield, MI, Michael W. Hartmann, Miller, Canfield, Paddock & Stone, Detroit, MI, for Defendants–Appellees.

Before: SUHRHEINRICH, CLAY and SUTTON, Circuit Judges.

CLAY, Circuit Judge.

Defendants–Appellants New Century Bancorp, Inc., Mary Garofalo and Thomas Sheridan appeal the March 26, 2002, order of the Honorable Victoria A. Roberts, United States District Judge for the Eastern District of Michigan, denying reconsideration of the March 8, 2002, order enforcing a settlement agreement between the parties. For the reasons discussed below, we **AFFIRM** the judgment of the district court.

## I

On September 27, 2000, Plaintiff Michigan Regional Council of Carpenters filed a complaint in the United States District Court for the Eastern District of Michigan against Defendants New Century Bancorp, Inc. ("NCB") and Steven Kirkpatrick, who was Chairman and a controlling shareholder of NCB. The allegations of the complaint centered around NCB's September 15, 1998, private offer to Plaintiff to purchase 430,000 shares of NCB common stock at $7.00 per share. In considering whether to buy the shares, Plaintiff requested information relating to the value of a proposed subsidiary corporation of NCB known as The Bancorp Group ("Bancorp"). According to the private offer, Kirkpatrick would contribute to NCB his shares of stock in Bancorp in return for NCB shares, thereby making Bancorp a subsidiary of NCB and Kirkpatrick the largest shareholder of NCB. On May 28, 1999, Bruce Carleton, President of New Century Bank, the primary subsidiary of NCB, sent Plaintiff three audited valuations of Bancorp.

Plaintiff alleges that it relied on NCB and Kirkpatrick's representation that Bancorp's valuation was in excess of $7,000,000.00. In reliance on this representation, on September 29, 2000, Plaintiff purchased 35,715 NCB shares, at a total purchase price of $250,005.00. According to Plaintiff, Defendants knew before September 29, 1999 that Bancorp's loan portfolio had many problems and that Bancorp's true value was below $7,000,000.00. Between July 1, 1999 and January 31, 2000, banking regulators required NCB to

re-value Bancorp as an essentially worthless entity by requiring it to write off almost the entire value of Bancorp's leasing portfolio, a fact that put NCB in financial peril. Plaintiff's complaint alleged that Defendants committed securities law violations with regard to representations regarding the valuation of Bancorp's lease portfolio.

NCB answered the complaint on October 20, 2000 and further alleged a cross claim against Kirkpatrick. Kirkpatrick answered the complaint on November 3, 2000 and cross claimed against NCB. On the same day, Kirkpatrick filed a third-party complaint against Bruce Carleton, J. Grant Smith, Mary Garofalo and Kimberly Mitseff.

On June 19, 2001, following preliminary discovery, Plaintiff was granted leave to file a first amended complaint. The amended complaint added as Defendants certain past and present members of NCB's Board of Directors, including Bruce Carleton, J. Grant Smith, Mary Garofalo, Kimberly Mitseff, Gary Vetter, William Kreger, Frank Stella and Thomas Sheridan. The amended complaint also named the accounting firm of Plante & Moran, which had created Bancorp's audited financial statements valuing the lease portfolio, valued NCB's stock with regard to the issuance of Kirkpatrick's shares of NCB stock, and acted as auditor for both NCB and Bancorp. Kreger filed a cross claim against NCB on August 24, 2001, and Stella and Vetter filed cross claims against NCB on September 7, 2001.

Prior to the November 7, 2001, status conference before the district court, the parties had been negotiating the specific terms of a settlement, and a draft of a written settlement agreement was in the works. There is no transcript of the status conference, apparently because the conference was conducted in chambers. According to a written order of the district court, all parties had been represented by counsel at the conference [1] and "had indicated to the Court that the matter was settled." (J.A. 443.) After the conference, the district court dismissed the case without prejudice, conditioned on the execution of a written settlement agreement. The court's order, captioned Order of Dismissal without Prejudice, stated, in relevant part:

> All parties were represented by counsel, who advised the Court that this matter is near settlement. Accordingly, the Court will DISMISS this matter WITHOUT PREJUDICE. Plaintiff will have 30 days to reinstate this case if the settlement agreement is not consummated for any reason. Once the settlement agreement has been approved, an order of dismissal with prejudice shall enter.

The terms of the oral agreement were memorialized in a document entitled "Settlement Agreement and Mutual Release of Claims." On the day of the November 7, 2001, status conference, Vincent Delorenzo, as Chairman of NCB and Defendant Garofalo in her individual capacity, executed the agreement. Defendant–Appellant Sheridan signed the agreement on November 8, 2001. On November 9, 2001, Adam Rosenberg, counsel for Defendants–Appellants Garofalo and Sheridan, among others, advised counsel for Defendants Stella and Vetter, that the agreement was "acceptable." [2] Plaintiff executed the agree-

---

1. During the settlement negotiations, the law firm of Hickey & Cianciolo, P.C. represented Defendant–Appellant NCB. Defendants–Appellants Garofalo and Sheridan had been represented by attorneys Barry Bess and Adam Rosenberg.

2. Later that day, Rosenberg requested a minor change to the agreement pertaining to certain of Defendants–Appellants' liability insurers. It is undisputed that this change had nothing to do with NCB, and no party has argued that this change has anything do with

ment on November 21, 2001, and Plante & Moran did the same on November 30, 2001. Only Defendants Carleton and Mitseff had not signed the agreement by the court-imposed 30–day deadline. At some point prior to December 14, 2001, Defendant–Appellant NCB started to perform under the agreement by forwarding to its counsel, Steven Hickey, a check in the amount of $25,000.00, representing its contribution to the settlement amount.

Contemporaneous with the settlement efforts in this case, several of the parties, including NCB, Vetter, Kirkpatrick, Carleton, Smith, Garofalo and Mitseff, were finalizing the settlement of a related matter pending in Oakland County Circuit Court. Pursuant to that settlement, NCB was paid approximately $920,000.00 to settle its claims against Vetter and Kirkpatrick. NCB also was required to pay Kirkpatrick $246,000.00 to settle his claims against NCB. The Oakland County Circuit Court entered a stipulated dismissal of the state case on December 5, 2001, after the parties had executed the agreement.

The district court reinstated the federal case on December 7, 2001 after being advised that Defendants Carleton and Mitseff had not signed the settlement agreement within 30 days of the November 7, 2001, status conference. By letter of December 14, 2001, counsel for NCB indicated for the first time that NCB intended to withdraw from the settlement. According to the letter, NCB had learned of "new information" that precluded it from granting releases to all of the parties to the litigation.

The district court held a status conference on January 4, 2002. At that time, counsel for Defendant–Appellant Garofalo advised the court that Garofalo intended to withdraw from the settlement, even though she already had executed the agreement. On the same day, Defendant–Appellant NCB substituted counsel, replacing attorney Steven Hickey with attorney James Elsman.

On January 7, 2002, Stella and Vetter filed a motion to enforce the settlement agreement. Plaintiff, Plante & Moran, Kirkpatrick, Sheridan, Kreger, and Smith joined the motion on various dates between January 11 and 17, 2002; Carleton and Mitseff also joined the motion to enforce the agreement.

On January 24, 2002, Defendant–Appellant Garofalo replaced her attorneys, Adam Rosenberg and Barry Bess, with James Elsman. Later, Defendant–Appellant Sheridan also substituted his counsel in favor of Mr. Elsman.

On February 11, 2002, Defendant–Appellants Garofalo and NCB opposed the motion to enforce the settlement agreement. Although Defendant–Appellant Sheridan initially had joined the motion to enforce the agreement, he reversed course and joined Garofalo and NCB in opposing the motion.

On March 8, 2002, the district court granted the motion to enforce the settlement agreement, holding that the document entitled Settlement Agreement and Mutual Release of Claims was binding on all parties. The court held no evidentiary hearing prior to ruling. It found that there was no genuine dispute that a settlement of all of the material terms had been agreed to by all of the parties. The court based its conclusion on the following findings of fact: (1) at the November 7, 2001, status conference, counsel for all of the parties "confirmed that an agreement had been reached, although not consummated in writing"; (2) all parties except Carleton and Mitseff had signed the written agree-

---

Defendants–Appellants' subsequent attempt to withdraw from the agreement.

ment, and Carleton and Mitseff's attorney had informed the parties that the agreement was acceptable to him; (3) NCB, Garofalo and Sheridan had not asserted that there were any changes to the material terms of the agreement after they executed it;[3] and (4) Sheridan, through his prior counsel, "unequivocally" had affirmed his consent to the agreement prior to attempting to withdraw his consent. The court rejected NCB, Garofalo and Sheridan's argument that "new information" suggested that some of the parties to the settlement had engaged in "frauds and misdeeds," ruling that the fraud allegations were "highly ambiguous" and further that they had advanced no legal argument as to why the agreement should be set aside on the ground of fraud. The district court denied NCB, Sheridan, and Garofalo's motion for reconsideration on March 26, 2002.

## II

Defendants–Appellants initially argue that the district court "may" not have had jurisdiction to enforce a settlement agreement between the parties, relying on *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) and *Hinsdale v. Farmers Nat'l Bank & Trust Co.*, 823 F.2d 993 (6th Cir. 1987). This Court reviews a district court's decision regarding subject matter jurisdiction *de novo, Re/Max Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 641–42 (6th Cir.2001) (citing *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 759 (6th Cir. 2000)), and holds that the district court had subject matter jurisdiction

In *Kokkonen, supra,* the litigants had reached an oral settlement that was recited on the record before the district court. The court then signed the parties' stipu-

lated order of dismissal with prejudice and did not reserve jurisdiction to enforce the settlement agreement. *Id.* at 376–77. Thereafter, the parties had a dispute about the agreement, and the district court enforced the agreement. *Id.* at 376. The Supreme Court held, however, that neither the Federal Rules of Civil Procedure nor the doctrine of ancillary jurisdiction provided the district court with jurisdiction to enforce the settlement agreement just because the agreement had arisen out of a case over which it had had subject matter jurisdiction. *Id.* at 378. Importantly, the Court noted:

> The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.

*Id.* at 381. *See also Hinsdale,* 823 F.2d at 995–96 (holding that the district court's unconditional dismissal of the action with prejudice and without any attempt to retain jurisdiction to enforce the settlement agreement "terminated the district court's 'jurisdiction except for the limited purpose of reopening and setting aside the judgment of dismissal within the scope allowed by Rule 60(b)' of the Federal Rules of Civil Procedure") (quoting *McCall–Bey v. Franzen,* 777 F.2d 1178, 1190 (7th Cir.1985)).

■ In the instant case, the district court dismissed the case on November 7, 2001 *without* prejudice and condi-

---

**3.** One minor change was made to the agreement after they had executed it, but it is

undisputed that they agreed to that immaterial change. *See* note 2, *supra.*

tioned on the execution of a written settlement agreement. *See* J.A. 250 (November 7, 2001, Order of Dismissal without Prejudice) ("Accordingly, the Court will DISMISS this matter WITHOUT PREJUDICE. Plaintiff will have 30 days to reinstate this case if the settlement agreement is not consummated for any reason. Once the settlement agreement has been approved, an order of dismissal with prejudice shall enter."). The district court reinstated the case on December 7, 2001 after being advised that the parties had not reduced the settlement to writing. A motion to enforce the settlement agreement was filed on January 7, 2002, after the court had reinstated the case, and therefore at a time when the case was pending before the court. Since the district court never relinquished jurisdiction over this matter, it had subject matter jurisdiction at the time it enforced the settlement agreement, consistent with the requirements of *Kokkonen* and *Hinsdale.*

### III

### A. Standard of Review

"This Court reviews for clear error the district court's factual determination that the parties had agreed to settlement terms; however, [the Court] review[s] the district court's decision to grant a motion to enforce the settlement based on its preliminary factual finding for an abuse of discretion." *Re/Max Int'l,* 271 F.3d at 645 (citing *Therma–Scan, Inc. v. Thermoscan, Inc.,* 217 F.3d 414, 418 (6th Cir.2000)). This Court finds an abuse of discretion

only when it is left with the " 'definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors' or where it 'improperly applies the law or uses an erroneous legal standard.' " *Id.* (quoting *Huey v. Stine,* 230 F.3d 226, 228 (6th Cir.2000) (citations and internal quotation marks omitted)).

### B. Validity of the Settlement Agreement

"Before enforcing a settlement, a district court must conclude that agreement has been reached on all material terms." *Re/Max Int'l,* 271 F.3d at 645–46 (citing *Brock v. Scheuner Corp.,* 841 F.2d 151, 154 (6th Cir.1988)). "Ordinarily, an evidentiary hearing is required where facts material to an agreement are disputed." *Id.* at 646. (citing *Kukla v. Nat'l Distillers Prods. Co.,* 483 F.2d 619, 622 (6th Cir.1973); *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1372 (6th Cir.1976)). "However, no evidentiary hearing is required where an agreement is clear and unambiguous and no issue of fact is present." *Id.* (citing *Aro Corp.,* 531 F.2d at 1372). "Thus, summary enforcement of a settlement agreement has been deemed appropriate where no substantial dispute exists regarding the entry into and terms of an agreement." (citing *Kukla,* 483 F.2d at 621; *Therma–Scan,* 217 F.3d at 419).

■■■ No evidentiary hearing was held prior to the district court's enforcement of the settlement agreement because no party had requested one.[4] Moreover, an evi-

---

4. Defendants–Appellants failed to request an evidentiary hearing prior to the district court's order enforcing the settlement agreement. Moreover, their request for an evidentiary hearing set forth in their motion for reconsideration was made in a perfunctory manner, without any accompanying legal argument or citation to authority. Since this issue was not developed in the district court, Defendants–Appellants have waived the issue of whether they appropriately requested an evidentiary hearing below. *See Noble v. Chrysler Motors Corp., Jeep Div.,* 32 F.3d 997, 1002 (6th Cir.1994) (holding that an observation in a footnote in a brief filed in the district

dentiary hearing was unnecessary because the existence of a binding settlement agreement was undisputed. As noted by the district court, at a November 7, 2001, status conference, all parties informed the court that the matter had been settled.[5] The parties had been negotiating the specific terms of a settlement prior to the status conference, and there was at least a draft of the written settlement agreement as of November 7, 2001. Appellees point out, and Defendants–Appellants do not dispute, that the material terms of this settlement included payments from Defendants Vetter and Kirkpatrick ($135,000.00),[6] Plante & Moran ($15,000.00), and NCB ($25,000.00) to Plaintiff; mutual releases by all parties; and payment of various Defendants' defense costs. We hold that the undisputed nature of the oral agreement, in itself, provided the district court with a sufficient basis to enforce the settlement agreement against Defendants–Appellants without first holding an evidentiary hearing. *See Re/Max Int'l*, 271 F.3d at 645 (holding that no evidentiary hearing was required and enforcing oral settlement agreement "because the record shows that all the essential terms had been agreed upon in open court and all that remained was to sort out the non-material details and put the agreement in writing"); *Aro Corp.*, 531 F.2d at 1372 (holding that summary enforcement of a settlement agreement was determinable solely as a matter of law, and therefore an evidentiary hearing was unnecessary, because the agree-

ment's terms were "clear and unambiguous").

■ The validity of the oral agreement was not undermined by the fact that the parties' attorneys, and not the parties themselves, had entered into the oral settlement agreement at the November 7, 2001, status conference. Defendants–Appellants were bound by their attorneys' oral agreement to compromise their claims. As a matter of Michigan contract law, which governs the validity of the settlement agreement in this case, attorneys are considered to have the apparent authority to settle lawsuits on behalf of their clients, and opposing parties have the right to rely upon the existence of such settlements when agreed to by attorneys. As this Court held in *Capital Dredge & Dock Corp. v. City of Detroit*, 800 F.2d 525, 530–31 (6th Cir.1986) (applying Michigan law):

> Generally, when a client hires an attorney and holds him out as counsel representing him in a matter, the client clothes the attorney with apparent authority to settle claims connected with the matter.... Thus, a third party who reaches a settlement agreement with an attorney employed to represent his client in regard to the settled claim is generally entitled to enforcement of the settlement agreement even if the attorney was acting contrary to the client's express instructions.... But for this rule of law, prudent litigants could not

court was insufficient to preserve argument concerning that issue on appeal).

5. There is a slight facial inconsistency between the court's November 7, 2001, order which indicates that the parties were "near settlement" and the court's March 8, 2002, order enforcing the settlement agreement which indicates that the matter "was settled." Defendants–Appellees, however, have proffered no facts to dispute the district court's predicate finding for the March 8, 2002, order

that, on November 7, 2001, their lawyers had "confirmed that an agreement had been reached, although not consummated in writing." Instead, Defendants–Appellants argue that the subsequent, *written* version of the settlement was invalid because all parties had not executed the document before their attempted withdrawal from the agreement. This argument is addressed below.

6. These funds would be paid pursuant to a director and officer liability insurance policy.

rely on opposing counsel's representation of authorization to settle.

*Accord Nelson v. Consumers Power Co.,* 198 Mich.App. 82, 497 N.W.2d 205, 208–09 (Mich.Ct.App.1993) (adopting reasoning and holding of *Capital Dredge;* holding that trial court properly enforced settlement agreement after finding that defendant had justifiably relied upon the plaintiff attorney's telephone and written communications that the settlement offer had been accepted). Here, there is no dispute that Defendant–Appellant NCB held its attorneys (Hickey & Cianciolo, P.C.) out as having the authority to represent it in defense and settlement (a) of Plaintiff's claims, (b) in NCB's cross claim against Defendant Kirkpatrick and (c) in NCB's counterclaim and third-party claim filed in state court against Defendants Vetter and Kirkpatrick, among others. There also is no dispute that Defendants–Appellants Garofalo and Sheridan held attorney Adam Rosenberg out as having the authority to defend against and to settle Plaintiff's claims. Thus, the remaining parties could reasonably believe that Defendants–Appellants' attorneys had the authority to enter into the settlement agreement at the November 7, 2001, status conference.

Even assuming that there was no valid oral settlement agreement in this case, there undoubtedly was a written agreement that all of the parties eventually executed or otherwise adopted. The terms of the oral agreement, affirmed by Defendants–Appellants' attorneys before the district court, were memorialized in a document entitled "Settlement Agreement and Mutual Release of Claims." On the day of the November 7, 2001, status conference, Vincent Delorenzo, as Chairman of NCB and Defendant Garofalo in her individual capacity, executed the agreement. Defendant–Appellant Sheridan signed the agreement on November 8, 2001. On November 9, 2001, Adam Rosenberg, counsel for Defendants–Appellants Garofalo and Sheridan, among others, advised counsel for Defendants Stella and Vetter, that the agreement was "acceptable." Plaintiff executed the agreement on November 21, 2001, and Plante & Moran did so on November 30, 2001. Only Defendants Carleton and Mitseff had not signed the agreement by the court-imposed 30-day deadline. As noted, however, on November 9, 2001, Carleton and Mitseff's attorney informed the other parties via email that the agreement was "acceptable," and, consistently, both joined with the motion to enforce the agreement. Thus, as of November 21, 2001, each of the parties had expressed their written assent to the settlement agreement either by signing it or by authorizing their attorney to accept the agreement in writing on their behalf. These written assents complied with the agreement's statute of frauds provision that the agreement "become[s] binding when ... signed by each of the parties and delivered to the other." (J.A. 282) (¶ 17). *Cf.* Michigan Court Rule 2.507(H) (2003) (Michigan statute of frauds rule providing that a settlement agreement in state court is binding when there is a writing "subscribed by the party against whom the agreement is offered or by the party's attorney").

At some point prior to December 14, 2001, NCB started to perform under the agreement by forwarding to its counsel, Steven Hickey, a check in the amount of $25,000.00, representing its contribution to the settlement amount. This fact, in conjunction with Defendants–Appellants' execution of the written agreement prior to their attempted rescission, further shows that a valid settlement agreement existed. Under Michigan law, these expressions of assent are generally sufficient to show a meeting of the minds. *See Sanchez v.*

*Eagle Alloy Inc.,* 254 Mich.App. 651, 658 N.W.2d 510, 517 (Mich.Ct.App.2003) (" '[W]hether ... a meeting of the minds occurred is judged by an objective standard, looking to the express words of the parties and their visible acts.' ... A meeting of the minds can be found from performance and acquiescence in that performance.") (quoting *Groulx v. Carlson,* 176 Mich.App. 484, 440 N.W.2d 644, 648 (Mich.Ct.App.1989)); *cf. Re/Max Int'l,* 271 F.3d at 646 (holding, under Ohio law, that "the objective acts of the parties" reflected that an agreement had been reached when the parties stated the general terms of their agreement on the record, even though the parties never executed a written settlement agreement as required by the court; among other things, one party tendered payment pursuant to the agreement, and another party attempted to consummate the settlement by preparing a written document).

██ Defendants–Appellants nevertheless contend that they were entitled to withdraw their assent to the agreement on December 14, 2001 simply because all of the parties had not yet signed the agreement as of that date.[7] As noted above, however, a valid settlement agreement need not be premised on a writing at all, let alone a writing signed by all of the parties. All of the parties agreed to the material terms of the agreement on November 7, 2001. *See Re/Max Int'l,* 271 F.3d at 645 ("The existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement.") (citing *Brock,* 841 F.2d at 154; *Kukla,* 483 F.2d at 621 (observing that the power of a trial court to enforce a settlement agreement has been upheld even where the agreement has not been arrived at in the presence of the court nor reduced to writing)); *Brock,* 841 F.2d at 154 (holding that the district court did not clearly err in enforcing the undisputed material terms of a settlement agreement created by parties' counsel over the telephone, even though parties never agreed on a written version of the agreement); *Scholnick's Importers–Clothiers,* 343.N.W.2d at 253 ("[W]here agreement has been expressed on all the essential terms of the contract, the mere fact that the parties manifest an intention to prepare a written memorial of their agreement does not render the oral contract unenforceable merely because the writing is never prepared.").

Moreover, the parties had an effective written agreement by no later than November 21, 2001 by which time all the parties had either signed and/or had expressed their explicit acceptance of the written agreement. The fact that Defendants–Appellants had a "change of heart" did not entitle them to disavow the written agreement. *See Metro. Life Ins. Co. v. Goolsby,* 165 Mich.App. 126, 418 N.W.2d 700, 701 (Mich.Ct.App.1988) ("[S]ettlement agreements should not normally be set aside and ... once a settlement agreement is reached a party cannot disavow it merely because he has had a 'change of heart.' ") (quoting *Thomas v. Mich. Mut. Ins. Co.,* 138 Mich.App. 117, 358 N.W.2d 902, 903 (Mich.Ct.App.1984)); *see also Reed v. Citizens Ins. Co. of Am.,* 198 Mich. App. 443, 499 N.W.2d 22, 24 (Mich.Ct.App.

---

**7.** Appellant Sheridan cannot make this argument because he expressed his intent to withdraw from the settlement three weeks *after* joining in Plaintiff's motion to enforce the settlement agreement. His attempted withdrawal occurred nearly two months after the two holdouts (Defendants Carleton and Mitseff) had already assented to the agreement.

1993) (holding that a party could not revoke settlement agreement after signing a copy of it and faxing it to her attorney because "[o]nce a contract to settle legal claims has been entered into, a unilateral change of mind is not a ground for excusing performance") (citing *Thomas, supra*).

Defendants–Appellants also argue that the settlement agreement was unenforceable because it did not comply with Michigan Court Rule 2.507(H). That rule provides:

> **Agreements to Be in Writing.** An agreement or consent between the parties or their attorneys respecting the proceedings in an action, subsequently denied by either party, is not binding unless it was made in open court, or unless evidence of the agreement is in writing, subscribed by the party against whom the agreement is offered or by that party's attorney.

MCR 2.507(H). The Michigan Court Rules, however, are rules of procedure for Michigan state courts and, therefore, do not govern the conduct of a federal district court. *See* MCR 1.103 ("The Michigan Court rules govern practice and procedure in all courts established by the constitution and laws of the State of Michigan."). In any event, the parties complied with MCR 2.507(H) because the agreement is in writing and had been signed by all Defendants–Appellants at the time the district court enforced the agreement.

Defendants–Appellants next argue that they could back out of the previously executed agreement, which provided for broad mutual releases, because Defendants Kirkpatrick and Plante & Moran had failed to reveal the full extent of their alleged fraud. On this point, Defendants–Appellants argue that after executing the agreement they learned "new information" of up to $30,000,000 of fraud, based on information pertaining to residual values on leases;

NCB not having title to leased equipment; "Suspicious Activity Reports" filed by NCB in 2000; investigations of NCB by state and federal regulators; Defendant Kirkpatrick's alleged improper receipt of 520,671 NCB shares and his alleged fraudulent arrangement to buy the shares at $3.16 per share; and the fact that NCB has had to charge off 51% of the lease portfolio that Kirkpatrick sold to NCB.

This "fraud" argument also is unavailing. First, Defendants–Appellees Garofalo and Sheridan never explain why they can avail themselves of the purported "new information" that Defendant–Appellant *NCB* cites as justification for its backing out of the settlement agreement. In fact, Garofalo and Sheridan have articulated absolutely no reason for backing out of the agreement. Second, even assuming that they can invoke NCB's justification, the record strongly indicates that the purported "new information" was not "new" at the time of the attempted rescission. NCB incorporated this very information into the third-party complaint it had filed against Kirkpatrick on July 31, 2000, over a year before it executed the settlement agreement. *See* J.A. 367–83 (reflecting NCB's allegations pertaining to Defendants Kirkpatrick's and Vetter's fraudulent leases transactions, inflation of residual lease values, and receipt of excessive amounts of NCB stock). NCB's responses to interrogatories in the related state-court action also show that this information was not new. *See* J.A. 391–94 (responses to Interrogatory Nos. 7 & 23) (providing extensive detail on Kirkpatrick's and Vetter's alleged fraudulent lease transactions and inflation of residual lease values; discussing examination of Kirkpatrick and Vetter by state and federal auditors; stating that Kirkpatrick was issued NCB stock based on his alleged misrepresentations). Likewise, there is a strong indication that NCB

had advance notice of Plante & Moran's alleged role in perpetrating the fraud of Kirkpatrick and others; in response to an interrogatory, NCB identified a Plante & Moran accountant and other representatives of that firm who would "testify as to the preparation, analysis, assumptions and other aspects of audited financial statements and other work done ... at the request of Mr. Kirkpatrick and Mr. Vetter." (J.A. 387–88.)

At most, Defendants–Appellants are complaining that some Defendants did not fully apprise them of the extent of their allegedly fraudulent acts, a circumstance that cannot void a settlement agreement as a matter of law. *See Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527 (2d Cir.1985) ("Thus, plaintiffs' argument is, in essence, that where the parties have sought to settle a claim of fraud, they cannot be bound by a settlement agreement unless the alleged defrauder has made full disclosure to the other party prior to settlement. We know of no authority to that effect...."). Rather, to void the settlement agreement, Defendants–Appellants would have to show that their execution of the agreement was procured by fraud. Fraud in the execution "occurs when a misrepresentation is made which induces a party [to] believe that he is not assenting to any contract or that he is assenting to a contract entirely different from the proposed contract." *Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F.Supp. 683, 689 (E.D.Mich.1997) (citing Restatement (Second) of Contracts § 163, cmt. a (1981)). Defendants–Appellants have not even attempted to demonstrate fraud in the execution.

## IV

In conclusion, the district court had subject matter jurisdiction to enforce the settlement agreement. Further, the district court did not clearly err in finding that the parties had concluded an agreement on all material issues settling this litigation. The parties' attorneys entered into an oral agreement covering all material terms, and those terms were later memorialized in the document entitled "Settlement Agreement and Mutual Release of Claims," which Defendants–Appellants executed. Accordingly, the court did not abuse its discretion in enforcing that settlement agreement. For these reasons, the district court's enforcement of the parties' settlement agreement is **AFFIRMED**.