**LELE MAGEO, TEOFILO MAGEO and SAPATI M. TUFAGA,**
Claimants,

v.

**VATAU TUFAGA GALEA`I NERIA, Objector.**

High Court of American Samoa
Land and Titles Division

LT No. 02-03

February 10, 2005

Before KRUSE, Chief Justice; MAMEA, Associate Judge; and TAPOPO, Associate Judge.

Counsel: For Lele and Teofilo Mageo, Marie A. Lafaele
For Sapati, Tufaga and Objectors, Arthur Ripley, Jr.

## OPINION AND ORDER

### Introduction

On March 4, 2002, claimants Lele ("Lele") and Teofilo Mageo (collectively the "Mageos") offered a certain registration agreement (the "Separation Agreement") for recording with the Territorial Registrar. The Separation Agreement relates to an 80' x 80' area of Tufaga communal land which the Mageos claim had been assigned to them by Sapati M. Tufaga ("Tufaga"), the sa`o (senior *matai*) of the Tufaga family of Aua.

After the Territorial Registrar publicly gave notice of the Mageo's offer to record the Separation Agreement, and immediately after the Mageos had openly commenced cutting down certain coconut trees on site in anticipation of building, objector Vatau Tufaga Galea`i Neria ("Neria") filed an objection with Territorial Register, on behalf of her daughter Sandra Neria ("Sandra"), claiming that the Mageos had encroached upon Sandra's assigned portion of land. Before filing her objection, however, Neria first contacted Tufaga, who was off-island at the time, by telephone. As a result of this telephonic conference, Tufaga sent word to the Mageos to halt their activity on the disputed site pending his return to Samoa within the next few months. Tufaga's instructions went unheeded and the Mageos nonetheless continued to build their home.

The Territorial Registrar eventually referred the resultant dispute over the Separation Agreement to the Land and Titles Division, following the parties unsuccessful attempts at mediation before the Secretary of Samoan Affairs ("SSA") pursuant to A.S.C.A. § 43.0302. The Clerk of Courts, upon receipt of the referral, captioned the matter as a dispute arising between the building owners (the Mageos) and the land owner (Tufaga for his family) of the one part, against the third-party objector (Neria) on the other. However, as the facts have unraveled before us, this dispute is actually one between the building owner on the one side, with the land owner and third-party objector on the other. In point of fact, the land owner seeks the expulsion of the home owners from family land.

After hearing the evidence presented by the parties at trial, the court ordered final arguments in writing and viewed the disputed area. Following the filing of written arguments, the Court, invoking the procedural flexibility afforded under A.S.C.A. § 3.0242 "to act in each case in such manner as the Land and Titles Division considers to be most consistent with natural justice and convenience", called *sua sponte* for additional evidence and briefing on a jurisdictional issue which the Mageos had only just raised, for the first time in these proceedings, at

final argument.

## Findings

As we alluded to above, the subject of the dispute is a portion of Tufaga family land which is known as *"Lealatele"* but which the Mageos singularly refer to as *"Lalolama."* The disputed area is a small but highly elevated tract located off the Aua-Vatia cross-island road part way up the steep mountainside toward the Mount Alava ridge. The site first came into being during the last major work to the cross-island road, after it was cleared and leveled by the road contractor who used the area as a place to store heavy machinery and equipment. The site commands splendid vistas of the Pago Pago Bay area and is, therefore, quite naturally a very desirable location for a home. Indeed, Lele had her eye on the piece for many years, and pressed Tufaga at every opportunity to let her build a home on the site. In fact, and unbeknownst to Tufaga, Lele had as early as August 1995 unilaterally commissioned a survey of the land demarcating an 80 foot by 80 foot plot plan for a home site positioned more or less in the middle of the disputed area. Lele had undertaken this survey covertly with the very evident purpose of being one step ahead of the rest of the Tufaga family, not only in the hope of securing Tufaga's approval *ex parte* but in contemplation of the Development Bank of American Samoa's application requirements for home loans appertaining to communal land. Tufaga, however, repeatedly put off giving Lele a reply one way or the other since he had plans about a site for himself.

Tufaga is absent from the Territory for extended periods of time, maintaining a second home on the mainland because of his need for ready access to certain medical facilities not otherwise available to him on-island. He is physically afflicted with compromised eyesight and ambulation, having earlier suffered severe injuries in an industrial accident while working with the federal government. The accident has left him with a debilitating condition now exacerbated with the onset of diabetic complications. Nevertheless, as *sa`o* of the Tufaga family, he frequently visits the Territory from time to time attending to family matters and to his duties as *sa`o*. Whenever Tufaga visits the Territory, Lele, who is a registered nurse, would always attend to his medical needs, his home medications, diabetic injections, and the regular monitoring of his general condition. Lele, who familiarly calls Tufaga "uncle", would exploit these opportunities to implore Tufaga to designate the disputed site for her use.

On one of his visits to the Territory, Tufaga finally assembled his extended family on a Saturday, March 2, 2002, at the disputed site, to publicly announce his decision regarding use of the disputed land area. His decision and action was prompted by Sandra's emergent need to

relocate her home, following Tufaga's commitment to the Mormon church in Aua of another area of Tufaga family land that included Sandra's then-assigned residential site. Consequently, the *sa`o* had resolved to relinquish his own plans for the disputed area in favor of not only Sandra but Lele as well, given the latter's longstanding importuning efforts for the site.

With the family assembled, including its lesser *matai*, Tufaga partitioned the disputed area into two parts designating the harbor-side portion of the clearing for Lele's use while pointing out the inland portion for Sandra's. Tufaga also designated a bisecting area in between the divided portions for use as common access to and from the main highway. To clearly demonstrate the subdivision, Tufaga used, and pointed out, certain tall standing coconut trees in the front and rear of the disputed area as boundary reference points. He then instructed Lele and Sandra to prepare the necessary paperwork, including plot plans, for formal confirmation of their respective assignments. At the same time, Tufaga had planned to, and did, return to the mainland the following Monday, March 4, 2002.

In anticipation of the *sa`o's* impending departure, Lele hurriedly presented Tufaga documentation for his signature that very Monday morning, March 4, 2002. However, contrary to the *sa`o's* instructions, Lele's documentation—a standard form separation agreement used by the Territorial Registrar's Office together with a standard form lease agreement employed by the Development Bank—incorporated her 1995 clandestine plot plan.[1] Although this 1995 plot plan referenced a mere 80' by 80' square foot area of land,[2] it sufficiently overlaps onto Sandra's assigned portion to effectively thwart any optimum opportunity for Sandra to situate her home on her assigned piece. The reason being is that Lele's 1995 plot plan strategically positions her proposed home right in the middle of the disputed area where Tufaga had provided for the common access way.

---

[1] Given the seemingly dizzying speed at which Lele had produced her paperwork (literally overnight into a Sunday), the unmistakable inference is that Lele had long ago prepared these documents in contemplation of an earlier assignment.

[2] In her haste, Lele obviously overlooked the fact that her documentation purported to grant her a much smaller area of land than that which the *sa`o* had publicly assigned to her. Moreover, the area designated by her 1995 plot plan is landlocked and without access to the main road. Thus on her version of the facts, Lele has effectively positioned herself between the proverbial rock and hard place.

Lele personally picked up Tufaga on that Monday morning and drove him to the Territorial Registrar's office where it was explained to Tufaga that he had to sign as the family *matai* certain documents characterized to him as "permission" to allow the Mageos to build their home. It is unclear to us where Tufaga actually executed Lele's documents. What is very clear on the evidence, however, is that Tufaga, who has failing eye sight and is quite unable to read, executed the documentation placed before him unaware that the papers were not in accordance with his instructions as publicly delivered before the assembled family two days beforehand. As it turned out, Tufaga had not only signed the Separation Agreement, but a lease (the "Lease") of the area surveyed in 1995.

Lele maintains that both the Separation Agreement and the Lease were signed by Tufaga at the Registrar's Office, after things were explained to him by the Registrar. However, there are two things about the signing exercise that does not sit well with us, causing us to doubt Lele's testimony. The first is that the Separation Agreement, a standard form from the Territorial Registrar's Office containing a *jurat* providing for the Registrar's signature, was never acknowledged before the Territorial Registrar. Since a notarized signature gives rise to a strong presumption of validity of the signatory's assent, *see Mailo v. Soane,* 4 A.S.R.2d 140, 141 (Land & Titles Div. 1987), that presumption is conspicuously absent here. Secondly, while Lele told us on the one hand that the Lease was signed at the Territorial Registrar's office in Fagatogo, she also confessed to driving Tufaga to the home of an acquaintance of her's in Pago Pago to have the Lease subsequently notarized. Again, we find this action puzzling in view of the fact that the Registrar is authorized to notarize legal instruments. To the contrary, Tufaga testified, and we have reason to believe him given his ambulatory difficulties, that he was kept waiting in the car while Lele obtained her friend's signature on the lease.

Under the circumstances, we find the inference compelling: Lele, in keeping with her furtive purpose throughout, had avoided notarization of the instruments at the Territorial Registrar to ensure that the details of the documentation were kept hidden from Tufaga. We are satisfied that Tufaga had no idea what it was he was signing, when Lele presented him both the Separation Agreement and the Lease for signing. We further find that Tufaga had no reason whatsoever to suspect that Lele would not comply with his very clear instructions delivered before the assembled family. As it was, Lele took advantage of a trusting and sick old man who had developed a certain degree of dependency upon her in her role as both a medical professional and as an outwardly filial and doting niece.

The Lease, unlike the Separation Agreement, somehow made it through the gubernatorial approval process without the Tufaga family any the wiser. Unlike the Separation Agreement matter, no one from the Tufaga family filed any objection to the Lease with the Territorial Registrar's Office. The reason for this inaction, we believe, was that both the *sa`o* and family were kept lulled by the pending dispute over the Separation Agreement. They thus had no cause to be especially vigilant for another related land issue with the Mageos.

In fact, the family had no actual notice of the Lease until the matter came to court and, consequently, Tufaga argues bias on the Territorial Registrar's part. Unfortunately their perception is not without some grounds. First, we are troubled with the Territorial Registrar's role in the resulting confusion. Among other things, the Territorial Registrar is the Secretary for the Land Commission, the body statutorily charged with reviewing communal land transactions and making recommendations for appropriate gubernatorial action. *See* A.S.C.A. § 37.0202-03. Although aware of the Tufaga family's ongoing dispute with the Mageos on the Separation Agreement, the Territorial Registrar, a nonlawyer, testified that she had nonetheless decided to withhold that information from both the Land Commission and the Governor on the reasoning that "the lease was a completely different matter." We find this premise somewhat astounding in light of the glaring fact that the Mageos' underlying plot plan for both the Lease and Separation Agreement was one and the same. Moreover, we regard it rather presumptuous for the Territorial Registrar to be making legal decisions on behalf of not only the Land Commission but the Governor, as that is properly the Attorney General's bailiwick. Had the Attorney General been consulted, we perhaps would not be faced with the anomalous situation before us today of a presumptively valid lease, with gubernatorial approval, between parties who are also properly before the Land and Titles Division on a disputed separation agreement concerning the exact same piece of land.

Second, we note from the Territorial Registrar's records that the lease document may not have been publicly posted within the village, as is the Registrar's practice in matters involving communal land. Apparently realizing two years after the Lease date that there was no village *pulenu`u* affidavit on file, certifying public posting of the lease within the village confines, *see* A.S.C.A. § 37.0103(a), the Territorial Registrar's Office perfunctorily produced one on May 17, 2004. This affidavit purported to certify posting by the village *pulenu`u* two years beforehand, between March 18-May 17, 2002. Of note, however, is the fact that the affidavit was not signed by the *pulenu`u* of Aua Village but by Eastern District Governor Faumuina. We greatly doubt the testimonial value of this affidavit given the two-year gap and given our difficulty in accepting that Faumuina, a *matai* of paramount stature,

would actually involve himself with the menial task of affixing public notices for the Territorial Registrar on utility power poles in and about the Eastern District.

Be that as it may, the Mageos, armed with their executed Lease and Separation Agreement, began building their home in accordance with their 1995 plot plan, while completely ignoring the *sa`o's* March 2, 2002-assignment directive. True to plan and nefarious design, the Mageos situated their home right in the middle of the disputed area to the obvious exclusion of Sandra, or anybody else, from any reasonable chance to share the site for residential purposes.

The Mageos defied all of the *sa`o's* efforts to maintain the status quo pending his resolution of the dispute. In March 2002, Tufaga sent word, via Neria, to the Mageos to cease their building, to no avail. Subsequently he dispatched Niumatalolo, a lesser *matai* of the Tufaga family, on two separate occasions, in April and June 2002, to caution the Mageos to stop their construction until his return to the Territory. These entreaties were also ignored. Finally, in September 2002, Tufaga actually returned to American Samoa and personally visited the site. After viewing the site and after determining that the Mageos had not only encroached upon Sandra's assignment but upon the common access-way that he had provided for, Tufaga then had the respective assignments staked out with red flag markers. He subsequently summoned both Sandra and Lele and, in the presence of another lesser *matai* of the family, Lemafa, directed Lele to relocate her building to the area he had initially designated. The Mageos again ignored the *sa`o* and his red flag markers and built their home to conclusion, as they saw fit.

■ From a Samoan perspective, the Mageos openly challenged the *matai's pule* (titular authority).[3] As a consequence, the *sa`o* fervently seeks the Mageos eviction from family property.

---

[3] Generally, *pule* is the authority vested in the *matai* to protect and conserve the family's assets, and includes the power to divide and allocate land to individual members for their use. *Lutu v. Taesaliali`i,* 11 A.S.R.2d 80, 87-88 (Land and Titles Div. 1989). Of course, *pule* must be exercised fairly and justly for the benefit of the family. *Tiumalu v. Scanlan,* 4 A.S.R. 194, 198 (Land & Titles Div. 1961).

## Discussion

### I. Jurisdiction

As above noted, the Mageos first raised a jurisdictional objection post-trial, in their written final arguments. They contend, without supporting authority, that the Land and Titles Division lacked jurisdiction over the leasehold issue because Sandra had not raised the Lease before the SSA under A.S.C.A. § 43.0202.

We summarily dismiss the argument as nothing but a dilatory and desperate attempt by the Mageos to further stall these proceedings. This is blatantly evident with their abject failure to raise this sort of argument prior to the tedium and expense of trial.

Section 43.0302(a) provides in relevant part:

> Before any action relating to controversies over communal land . . . may be commenced in the Land and Titles Division, each party shall file with his complaint a certificate signed and attested by the Secretary of Samoan Affairs . . . in which the Secretary . . . affirms and states: (1) that on at least 2 occasions, the parties have appeared personally before him and 2 persons designated by him, without an attorney or counsel, and that an attempt was made to resolve the controversy; . . . (4) . . . the reason why the controversy could not be resolved.

All that the enactment requires is that parties to a dispute concerning communal land first submit themselves to settlement conferences before the Office of Samoan Affairs. Once the parties have complied and the SSA certifies an irreconcilable dispute, the matter is ripe for judicial resolution.

In the matter before us, our record reveals that the SSA did file such a certificate with this court on June 26, 2002. Whether or not the Lease was raised before the SSA (it was not, as neither the sa`o, Neria, nor Sandra had actual knowledge of a lease) is entirely of no consequence as there is absolutely nothing in § 43.0302 that requires parties to a land dispute to present arguments or submissions of a legal nature before the SSA. The enactment simply does not contemplate a procedure whereby legal niceties are debated before the SSA. Furthermore, the SSA has no authority to adjudicate legal rights or the strengths of a party's legal position (otherwise, the Mageos would have had every reason to raise the Lease themselves).

374

Here, the basis of the land dispute between the *sa`o* of the Tufaga family and the Mageos is all about the exercise of *pule*. The *matai's* primary concern is allowing Lele's defiance—her refusal to accept the *matai's* authority to administer family land according to the customs of the Samoan people[4]—to take root and become a precedent within the family. Tufaga testified to his being worried about others following Lele's example, and making a mockery of the *matai's pule* over family lands.

That, in a nutshell, was the only cognizable dispute before the SSA, not the validity of Lele's land documents. Since the dispute between Tufaga and Mageo did not resolve extra-judicially before the SSA, a § 43.0302 certificate was appropriately issued. We therefore assert jurisdiction. *See* A.S.C.A. § 3.0208(b).

## II. Fraud

For reasons discussed below, we hold that the Mageo's Lease and Separation Agreement, upon which they base their claim to entitlement to the disputed area, are both void and unenforceable. We conclude that these instruments were secured from Tufaga by fraud and the Mageos will accordingly take nothing thereby.

Fraud is "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." BLACK'S LAW DICTIONARY 594 (5th ed. 1979). A contract is deemed fraudulent where a party: (1) conceals or falsely represents a material fact; (2) has knowledge of the concealment or falsity; (3) has intent to induce the other party into executing the agreement; (4) the other party actually acts in reliance upon the false representation or concealment; and (5) the other party is damaged. *Mailo v. Aumavae*, 30 A.S.R.2d 175, 177 (Lands & Titles Div. 1996).

When a fraudulent representation or concealment relates to an essential term of the agreement, the fraud is said to be in the "execution" of the document. *Id.*, *Sandvik AB v. Advent Intern. Corp.*, 220 F.3d 99, 109 (3d Cir. 2000) (stating that fraud in the execution is present when a party enters into a contract "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms"), RESTATEMENT (SECOND) OF CONTRACTS § 163 (1979). Under such

---

[4] *See Leapaga v. Masalosalo* 4 A.S.R. 868, 871 (App. Div. 1962); *Lutu v. Fuimaono*, 4 A.S.R. 450, 454 (Trial Div. 1964) ("In accordance with Samoan custom . . . the matai has . . . has jurisdiction over the land of his family."); *Lolo v. Heirs of Sekio*, 4 A.S.R. 477, 481 (Trial Div. 1964); *Tiumalu v. Scanlan*, 4 A.S.R. 194, 198 (Trial Div. 1961).

circumstances, a party is led to believe that "he is assenting to a contract entirely different from the proposed contract." *Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.,* 976 F.Supp. 683, 689 (E.D.Mich. 1997). An agreement obtained through fraud in the execution lacks mutual assent and is void. *Mailo,* 30 A.S.R.2d at 177; *Sheffield v. Andrews,* 679 So.2d 1052, 1053-54 (Ala. 1996) (fraud in the execution present where contract with altered terms presented to elderly women with failing eyesight); RESTATEMENT (SECOND) OF CONTRACTS § 163 (1979); *see also Langley v. FDIC,* 484 U.S. 86, 93 (1987).

■ In the present controversy, Lele committed fraud when she presented the Separation Agreement and Lease to Tufaga that differed in content from Tufaga's earlier oral instructions knowing that because of his failing eyesight he could not read them. Additionally, she knew full well that she held certain sway over the *sa`o,* having carefully cultivated with him over the years a certain relationship of trust and dependence. Lele's conduct satisfies the five-part test for fraud:

> (1) Lele concealed a material fact because she did not alert Tufaga that the documents effectively gave her alone an interest in the disputed site, rather than a shared interest with Sandra, as Tufaga had instructed several days earlier;
> (2) Lele had knowledge of the concealment because she was present when Tufaga ordered the land split into two, yet she nonetheless generated documents for his signature that stated otherwise, knowing that because of Tufaga's failing eyesight, he would be unable to read them;
> (3) Lele had intent to induce Tufaga into executing the agreement because she was the one who procured the documents, personally delivered them to Tufaga and asked for his signature;
> (4) Tufaga acted in reliance on the concealment because Lele's writings clearly contradicted Tufaga's orally expressed intent, as communicated to the entire family several days earlier. Thus, had Lele not concealed the true content of the documents, Tufaga would not have put his signature on them; and
> (5) the concealment caused Tufaga damage because land under his control was registered in a manner contrary to his intent.

■ Moreover, Lele's conduct may be regarded as fraud in the execution, automatically voiding the documents. When a party to a contract misleads another party as to an essential term of that contract, the former party commits fraud in the execution. *Zurcher v. Herveat,* 605 N.W.2d 329, 337 (Mich. Ct. App. 1999). Here, Lele misled Tufaga into believing that the documents he was signing accurately reflected

Tufaga's intended division of the *Lealatele*. However, the documents did not reflect Tufaga's intentions. Instead, Lele simply incorporated her own plot plan in the Separation Agreement and the Lease. Because Tufaga was unaware that an essential term of the documents he was signing differed from his original intent, he lacked the mutual assent necessary to make those agreements binding. And, therefore, because Tufaga did not assent to the Separation Agreement and the Lease, those documents are void and unenforceable.

## III. Eviction

■ In *Coffin v. Mageo,* 4 A.S.R. 14, 17 (Land & Titles Div. 1970), this court noted: "The matai of the family has the right to evict any person from communal lands if . . . the matai performs his obligation to protect family members against the wrongdoings by other members of the family." Thus in *Gi v. Leia,* 11 A.S.R.2d 137, 142 (Land & Titles Div. 1989), this court upheld the *sa'o's* expulsion of family members who ignored and disobeyed his legitimate directives, in the exercise of his *pule,* while attempting to resolve a land dispute between rival family groups.

■ We conclude on the facts that Tufaga, as *sa'o,* was justified in evicting the Mageos from Tufaga family lands. The *matai's pule* over family land goes to the very integrity of the Tufaga family as a Samoan institution.[5] The Mageos utter disregard for that *pule* was flagrant and extremely offensive. First, their commissioning a survey of Tufaga family land back in 1995, without Tufaga's knowledge or permission, was unlawful and in violation of A.S.C.A. § 37.01029(d).[6] Second, and in light of the notoriety of the land assignments at issue, the Mageos refusal to obey the *sa'o's* subsequent directives to suspend their construction was nothing less than an outright attempt to belittle the *sa'o* before the family and undermine his *pule.* Tufaga's directives were, under the circumstances, an eminently reasonable exercise of *pule*; he was, after all, simply trying to intervene as the *sa'o* of a Samoan family in a land dispute between people living within the Tufaga family. By failing to heed the *matai's* demands, the Mageos effectively encroached

---

[5] "The twin cornerstones of the Samoan way of life are communal land tenure and the matai system. Each is essential to the other. Without the matai system to administer it, the communal land system becomes anarchy. Without the communal land system, there is no reason for the matai." *Pen v. Lavata'i,* 30 A.S.R.2d 10, 15 (App. Div. 1996) (*quoting Tavai v. Silao,* 2 A.S.R.2d 1, 2 (Land & Titles Div. 1983)).

[6] This enactment provides that "[o]nly the senior matai of a Samoan family has the authority to request a survey of communal property of that family."

upon Sandra's assigned portion of family land, lending credence to Tufaga's concerns about family members getting similar self-help ideas to family lands.[7] We agree with Tufaga that such defiance, if left unchecked, could well prove to be a disastrous family precedent. The petition for eviction will, therefore, be granted.

## IV. Unjust Enrichment

■ The question which next ensues is whether the Mageos are entitled to equitable compensation for the improvements they have made to *Lealatele*. "Such relief . . . is available . . . to an occupant who has made improvements in 'good faith.' *Fonoti v. Fagaima*, 5 A.S.R.2d 158 (Land & Titles Div. 1987); *Roberts v. Sesepasara*, 8 A.S.R.2d 124 (Land & Titled Div. 1988), and whose possession must have been under some color or claim of title." *Faleatua v. Tauiliili*, 19 A.S.R.2d 122, 125 (Land & Titles Div. 1991). The corresponding duty to compensate is derived from the "unjust enrichment of the land owner . . ." *Roberts v. Sesepasara, supra*, at 131.

■ Here, the Mageos were not "good faith" improvers. They built their home over the repeated objections of the *matai*, and "knowledge of an adverse claim ordinarily prevents a possessor from being in good faith for the purpose of receiving compensation for improvements upon eviction." *Tulisua v. Olo*, 8 A.S.R.2d 169, 172 (App. Div. 1988); *Faleatua v. Tauiliili*, 19 A.S.R.2d 122, 125 (Land & Titles Div. 1991) ("Ordinarily, an improver's knowledge of an adverse claim vitiates a claim to 'good faith' for purposes of receiving compensation.") Unyielding in their disregard of the *matai's* instructions, the Mageos stubbornly pressed on to complete building their home. Under the circumstances, "[they] did so at [their] peril," *Tulisua*, 8 A.S.R.2d at 172, and, therefore, they are not entitled to equitable relief.

They may, however, remove their house or abandon it in favor of the Tufaga family. That is not to say that the parties cannot negotiate a sale agreement of the house since its removal would most certainly be wasteful. On the other hand, if the parties cannot arrive at such an agreement, then the Mageos shall remove their property from the disputed area within 60 days of date hereof or otherwise their

---

[7] As a blood member of the Tufaga family, Sandra's entitlement or proprietary interest in the land, as assigned by the *matai*, is not only constitutionally protected, *Pen v. Lavata`i*, 25 A.S.R.2d 164, 168 (Land & Titles Div. 1994), but may only be revoked for cause by the *matai*. *Taesali v. Samuela*, 3 A.S.R. 359, 361 (Trial Div. 1958). The Mageos' land-grab was tantamount to an attempted revocation of Sandra's constitutionally protected interest by a non-*matai*.

improvements will inure to land.

## Order

1. The Separation Agreement is void and unenforceable and is therefore not a registrable instrument.

2. The Lease is void and unenforceable and its registration with the Territorial Registrar is hereby set aside.

3. The Mageos shall vacate the disputed land area as hereinbefore stated within 60 days of date hereof.

It is so ordered.