**MANUELE GREEN, Plaintiff,**

v.

**CONGREGATIONAL CHRISTIAN CHURCH AMOULI, LEATULAGI FA'ALEVAO, UTU SIAMU, FUATA PEPA, jointly and severally, Defendants.**

High Court of American Samoa
Trial Division

CA No. 25-01

April 27, 2005

Before RICHMOND, Associate Justice; MAMEA, Associate Judge; and TAPOPO, Associate Judge.

Counsel: For Plaintiff, Mark F. Ude
For Defendants, Arthur Ripley, Jr.

## OPINION AND ORDER

### Background

The Congregational Christian Church in Amouli ("CCCAS") came to an agreement with HEPA Green General Construction and its proprietor Manuele Green ("Green"), whereby Green agreed to build the CCCAS's newest church and pastor's residence in Amouli. The negotiations took place during the summer of 1998. At the end of July and beginning of August of that year, the parties met several times to discuss their proposed agreement and ended up producing three separate documents. Each document appeared to be a final and complete contract, signed by both parties, but containing different terms.

The first document, dated July 28, 1998 (July 28 document), is the least detailed of the three purported agreements. Green delivered the signed July 28 document, entitled "Contract Agreement," to CCCAS's Reverend Elder Leatulagi Fa'alevao (Fa'alevao), who then put his own signature on it. The July 28 document does not specify a contract price or a completion date for the construction of the church buildings. The document does, however, specify that the CCCAS should pay 50% of the contract price up-front and the other 50% upon completion of the project. Additionally, the document provides that Green shall furnish all materials and services needed to construct the buildings.

The next day Green sent a letter to Fa'alevao, entitled "Work Proposal," which stated that Green was submitting a proposal for the job. The work proposal stated that Green would build the church structures for $397,850.00, but had an "open mind for negotiation."

On August, 2 1998, the second of the three possible contracts was prepared (August 2 document). On that date Fa'alevao, members of the church and Green met to discuss the construction agreement. At the end of the meeting, and despite the presence of the earlier July 28 document', Fa'alevao drafted the August 2 document and had it signed by Green, himself and other leaders of the church. The August 2 document is entitled "Contract Agreement For Construction of the Amouli CCCAS Building."

The August 2 document contains different and additional terms than the earlier July 28 document. The July 28 document did not specify a contract price, but the August 2 document cites the $397.850.00 figure suggested in Green's July 29 letter. Also, where the July 28 document stated that CCCAS shall provide 50% of the contract price up-front, the August 2 document states that the church shall provide 50% of the contract price "as the work proceeds," including a $45,000 initial

97

payment, and the remaining 50% at the completion of the project. Lastly, where the July 28 document did not specify a date of completion, the August 2 document stated that project should be finished within seven months unless "complications" occurred whereby Green would be given a two month grace period.

Consistent with the August 2 document, CCCAS made the initial $45,000 payment the next day, on August 3, 1998.

However, on August 4, Green came to CCCAS with yet another document (August 4 document). Green brought this document to Fa'alevao and, telling Fa`alevao that the August 4 document was identical to the August 2 document, asked Fa'alevao to sign it. Fa`alevao and other church leaders signed it.

However, in truth, the August 4 document provided different terms than the previous documents. The most prominent and material alterations dealt with the manner of payment and the date of completion. Where the August 2 document provided that the initial 50% payment would be paid "as the work proceeds," Green made sure that the August 4 document stated that the initial 50% payment would be up-front in its entirety. Also, where the August 2 document stated that the project must be completed within seven months, with a two month grace period, the August 4 document provided that the work must be "substantially completed" within seven months, except that the time of completion would be contingent on "strikes, accidents, performance of subcontractors, availability of materials and other delay beyond Contractor's reasonable control."

Green drafted the August 4 document and Fa'alevao and the others signed the document, despite the fact that within the past seven days, the parties had already drafted and signed two other documents, each document claiming on its face to be the final representation of the deal.

Then, on August 17, 1998, Green initiated construction on the CCCAS property, despite the fact that it should have been unclear to each of the parties which of the three documents, and its unique terms, represented the final agreement to the deal.

On October 6, 1998, CCCAS made the first of what would be 18 separate payments to Green, the last on July 10, 2000, nearly 2 years after the signing of the three documents. Between those 18 separate payments, CCCAS put forth a total of $191,033.40[1] towards the only specified contract price, roughly 48% of that $397,850.00 amount.

---

[1] This figure includes the $45,000 down payment.

During that nearly two year span, Green continued to work on the church premises, but, as of the date of that final July 10, 2000 payment, the project had yet to be completed.

The deal officially collapsed when, on June 28, 2000, CCCAS sent a letter to Green, informing him that it was terminating the contract because he had failed to complete the project in the time specified. CCCAS further informed Green that neither he nor his workers were to enter the CCCAS property or remove their tools and materials from the premises. CCCAS then hired other contractors to finish the church.

On April 11, 2001, Green filed the current breach of contract suit, alleging that CCCAS violated the agreement by not paying Green as was specified under the contract and was illegally holding Green's equipment. Defendants responded to the complaint, and filed a counterclaim, contending that their payment scheme was consistent with the contract and that they finally stopped payment because Green was in breach by failing to complete the church within the time specified in the agreement. On November 18 and November 22, 2004, we held a trial on the matter.

## Discussion

Our discussion will be broken into two parts. First, we will analyze the three documents to determine which one of them represents the parties' final contract. Second, we will apply the facts of the case to that contract to establish whether either of the parties is in breach.

### I. What are the Binding Terms of the Agreement?

On three separate occasions, in a seven day span, the parties drew up and then signed a document which appeared to be a contract. However, each of those three documents contained different terms. Therefore, the question is, between the three documents, what are the actual binding terms to the agreement?

On July 28, 1998, the parties drafted the first of the three documents. However, we can disregard the July 28 document because it does not appear that the parties mutually assented to the deal at that time. "[A]n essential prerequisite to the formation of a contract is an agreement: a mutual manifestation of assent to the same terms." JOHN D. CALAMARI, JOSEPH M. PERILLO, THE LAW OF CONTRACTS 25 (1998). An important part of the concept of "mutual assent" is the idea that the parties must intend to enter into a final and complete agreement. *See, e.g., Dohrman v. Sullivan*, 220 S.W.2d 973, 975 (Ky. 1949) (stating that

intent to enter a "final and complete" agreement is "essential" to the formation of a contract). If facts surrounding a particular writing indicate that the parties planned to further negotiate the deal, then the parties have not mutually assented to that writing and it is not a binding contract. *See Garaets v. Halter*, 588 N.W.2d 231, 234 (S.D. 1999) (holding that "[e]nsuing negotiations evidence absence of intent that the purchase agreement constitutes a final and complete agreement"); *Intermountain Forest Management Inc. v. Louisiana Pacific Corp.*, 31 P.3d 921, 925 (Idaho 2001) (holding that an important element in finding the intent necessary to form a contract is "whether the negotiations indicate that a written draft is contemplated as the final conclusion of negotiations").

In the current controversy, it does not appear that Green felt that the July 28 document was a final and binding agreement. The day following the July 28 document, Green sent a letter to CCCAS stating that he was submitting a proposal for the construction job and further stating that his proposed bid amount was still open for negotiation. If it was Green's intent to sign a final and binding agreement on July 28, he would not have sent to CCCAS the "Work Proposal" the very next day, stating that the deal was still open for negotiation. Moreover, no church leaders besides himself signed the July 28 document, a prerequisite to entering a CCCAS contract according Fa'alevao. Thus, Green and CCCAS did not mutually assent to the July 28 document and therefore its terms are not binding upon the parties.

The August 2 document, on the other hand, allows for a much more compelling argument for mutual assent. In preparation of that document, all of the material parties to the contract met to discuss the terms of the deal. At the end of the discussion, Fa'alevao drew up the August 2 document, adding the previously absent terms relating to the contract price and the date of completion. Then, Fa'alevao, several other church leaders, and Green signed the agreement. The parties even went to the trouble of appointing two attendees of the meeting to observe the ceremony and sign their own names to the agreement as witnesses. These acts are consistent with what parties would do when their intent is to form a final and binding written agreement.

Then, on August 3, 1998, consistent with the terms of the August 2 document, CCCAS gave Green a $45,000 down payment for the construction of the church buildings. By offering the $45,000 down-payment, CCCAS indicates a understanding that the August 2 document is final and binding; and Green, by accepting that payment, indicates a similar understanding.

The circumstances surrounding the August 4 document, the third and final of the relevant documents, does not suggest that the parties mutually assented to the terms of that document. Green drew up the August 4 document, knowing that its terms were materially different than the August 2 document, and then brought it to Fa'alevao, telling him that its terms were identical to their previous agreement. Such circumstances raise the issue as to whether the August 4 document was procured through the use of fraud.

 Fraud is "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." BLACK'S LAW DICTIONARY 594 (5th ed. 1979). When a party to an agreement makes a false representation relating to an essential term of the agreement which induces the other party to sign the contract, the defrauding party has committed fraud in the 'execution'. *Mailo v. Aumavae*, 30 A.S.R.2d 175, 177 (Lands & Titles Div. 1996); *Sandvik AB v. Advent Intern. Corp.*, 220 F.3d 99, 109 (3d Cir. 2000) (stating that fraud in the execution is present when a party enters into a contract "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms"); RESTATEMENT (SECOND) OF CONTRACTS § 163 (1979). Under such circumstances a party is led to believe that "he is assenting to a contract entirely different from the proposed contract." *Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F.Supp. 683, 689 (E.D.Mich.1997). An agreement obtained through fraud in the execution lacks mutual assent and is void. *Mailo*, 30 A.S.R.2d at 177; *Sheffield v. Andrews*, 679 So.2d 1052, 1053-54 (Ala. 1996) (fraud in the execution present where contract with altered terms presented to elderly women with failing eyesight); RESTATEMENT (SECOND) OF CONTRACTS § 163 (1979). *See also Langley v. FDIC*, 484 U.S. 86, 93 (1987).

In the current controversy, CCCAS alleges that Green induced it into signing the August 4 document by telling Fa`alevao that it was identical to their previous agreement, when in fact the contract they were signing was entirely different and less favorable to church than the previous agreement. Green, however, contends that even if he did not alert Fa'alevao to the changes he made to the contract, Fa'alevao nonetheless had a duty to read the contract before signing it. Green maintains that CCCAS cannot now dispute the unfavorable changes he made to the contract because CCCAS took the risk that such changes might be present when its officials signed the contract without reading it.

█ We find that the August 4 document is not a binding contract because the parties never assented to the agreement. We find credible the testimony indicating that Green induced the CCCAS officials into signing the August 4 document by misrepresenting the content of that document.

And, further, our conclusion is unaffected by the fact that the CCCAS officials may not have read the contract before signing it. It is true that a party to a contract has a duty to read its contents; however, this is not true when fraudulent inducements may have convinced the party to forgo an examination of the document. *See Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1028 (2nd Cir. 1991) (stating that "absent fraud or misrepresentation, [a contracting party] is bound by the terms of the [contract], and cannot thereafter complain that he did not read or know the terms.") (internal quotations omitted).

Additionally, the evidence indicates that during the performance phase of the contract, the parties did not act consistent with the terms provided in the August 4 agreement. This leads us to believe that they never assented to the terms of that document. The August 4 document provided that the initial 50% payment should have been made up-front, with the remaining 50% of the contract price due at completion. The parties, however, never proceeded in that manner. Instead, CCCAS made its $45,000 down payment and then continued to offer a series of many smaller payments. There is no evidence to indicate that Green objected to this manner of payment, or asserted that these payments were inconsistent with the terms of the contract. Thus, we simply do not feel that the parties assented to the August 4 document.

After considering the testimony and analyzing the facts and circumstances surrounding the negotiations, we find that the August 2 document contains the binding terms of the parties' agreement. The circumstances surrounding the signing of the contract indicate that the parties intend for it to be a binding representation of the deal. And, further, once performance started, the parties acted consistent with its terms. The August 2 document provided for gradual payments, and that is exactly what CCCAS did. It made 18 separate payments, and Green never objected to that manner of payment. And, lastly, the August 2 document provided for a $45,000 down payment. On August 3, CCCAS gave $45,000 to Green, who accepted the money. These acts indicate that the parties assented to terms of the August 2 document and considered those terms binding upon them.

## II. Did Either of the Parties Breach the Contract?

Green alleges that Defendants breached the contract by failing to remit payment as provided under the contract. Defendants, in their countersuit, maintain that Green breached the contract by failing to complete the project in the specified time. Having established what the binding terms of the agreement are, we can now apply the facts of the case to those terms to determine whether either of the parties is in breach of contract.

## A. Is Green in Breach of Contract?

Defendants allege that Green is in breach of contract because he did not complete the church buildings in the time specified in the August 2 document (now the contract). The contract provides that work on the church should be completed in seven months unless "complications" occurred whereby Green would be given a two month grace period. It is undisputed that the contract was signed on August 2, 1998 and that on June 28, 2000, when CCCAS officially terminated the contract, the church buildings had yet to be completed. This is a span of nearly two years. Thus, under the terms of the contract, even if complications had arisen, thereby triggering the two month grace period, Green would have been well over a year behind schedule. Thus, by all accounts, Green was in breach of the contract because he failed to complete the project within the specified period of time.

## B. Is CCCAS in Breach of Contract?

Green alleges that Defendants are in breach of contract because CCCAS failed to pay him as specified in the contract. The contract provided that CCCAS was to pay the first 50% of the contract price "as the work proceeds," including an up-front $45,000 down payment, with the remaining 50% to be paid upon successful completion of the church buildings.

The evidence indicates that CCCAS provided to Green a $45,000.00 down payment and then $146,033.40 in smaller, separate payments during the time in which Green was working on the project. These payments totaled $191,033.40, or nearly 48% of the $397,850.00 contract price. This payment scheme is entirely consistent with any fair reading of the contract language. The contract simply mandated that CCCAS provide the first 50% "as the work proceeds." After examining the payment history in this case, it is clear that CCCAS did just that and only stopped short of the full 50% when it determined that Green was in breach. CCCAS made its first regular payment on October 6, 1998 and proceeded to make additionally payments every couple of months until the contract collapsed. Therefore, we find that CCCAS is not in breach of the contract.

## III. Dispossession of the Construction Tools

Green asserts that following the cancellation of the contract, CCCAS wrongfully held Green's construction equipment.[2] It is unclear from the

---

[2] The equipment include a compactor, router, vibrator, five wheelbarrows, a chipping hammer, three crowbars, five shovels, three

evidence whether or not CCCAS has ever returned the equipment or whether, in fact, any of the equipment items or Green sustained any damages due to the dispossession. From what evidence we have seen it appears that CCCAS may have committed either a conversion[3] or trespass to chattel[4] upon the property. Therefore, if CCCAS continues to possess those tools or knows about their whereabouts, we urge it to promptly cause those tools to be returned to Green. However, in the event that the parties cannot settle this issue amongst themselves, we will continue to exert jurisdiction over this segment of the dispute.

## IV. Damages

■ "[T]he proper measure of damages in . . . cases involving building contracts is the cost of repairing the defects or completing the work and placing the construction in the condition it should have been if properly done under the agreement contained in the building contract." *Steinbrecher v. Jones,* 153 S.E.2d 295, 304 (W. Va. 1967). In the present controversy, Green failed to complete the church buildings in accordance with the terms of the contract, forcing CCCAS to use other means in finishing the project. CCCAS is thus due the extra costs it incurred in getting the project into the condition it should have been in had Green acted properly under the contract. An examination of the evidence reveals that CCCAS spent a total of $400,575.15 building the church, including amounts paid to Green and the extra costs incurred in finishing the church buildings after Green's breach. Under the contract, Green had agreed to build the church for $397,850.00[5]. Thus, as a result of Green's breach, CCCAS was forced to spend an extra $2,725.15 to complete the church buildings. Therefore, we hold that due to Green's breach of contract, CCCAS was damaged in the amount of $2,725.15.

---

extension cords, and a set of socket wrenches.

[3] An interference of another's property which so seriously interferes with that person's right of control that the interferer should be made to pay the full value of the chattel. *See* RESTATEMENT (SECOND) OF TORTS § 222A (1965).

[4] An intentional dispossession of another's chattel which has impaired the chattel's condition or deprived the owner of its use. *See* RESTATEMENT (SECOND) OF TORTS §§ 217, 218 (1965).

[5] We will note here that, despite Green's allegations, his June 5, 2000 change order did not increase the contract price. The contract specifies that CCCAS may request a change order but makes no mention of Green's power to do so. And, further, there is no evidence that CCCAS ever approved of or agreed to Green's proposed change order, which would, in effect, be an alteration to the contract. Therefore, we find that the June 5, 2000 change order is non-binding and in no way affects the parties' duties and obligations under the contract.

## Order

Green is in breach of contract with CCCAS and shall pay CCCAS $2,725.15. It is so ordered.